# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **BLAKE EDWARD HOUSEHOLDER,** | ) | |
| Plaintiff | ) | Civil Action No. 1:21cv00010 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Blake Edward Householder, ("Householder"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Householder protectively filed his application for DIB on August 9, 2019, alleging disability as of June 1, 2018, based on functional neurological disorder; post-traumatic stress disorder with active psychosis, ("PTSD"); bilateral shoulder strain; bilateral knee patellofemoral syndrome; bilateral lower extremity radiculopathy; thoracolumbar strain; painful chest scars with soft tissue damage; residuals of punctured lung; arthritis; sleep apnea; degeneration of the spine; depression; and anxiety. (Record, ("R."), at 15, 168-69, 200, 213, 235.) The claim was denied initially and upon reconsideration. (R. at 103-05, 111-14.) Householder then requested a hearing before an administrative law judge, ("ALJ"). (R. at 115-16.) The ALJ held a hearing on June 17, 2020, at which Householder was represented by counsel. (R. at 35-60.)

By decision dated September 8, 2020, the ALJ denied Householder's claim. (R. at 15-29.) The ALJ found Householder meets the nondisability insured status requirements of the Act for DIB purposes through September 30, 2023. (R. at 17.) The ALJ found Householder had not engaged in substantial gainful activity since June 1, 2018, the alleged onset date.[2] (R. at 18.) The ALJ determined that Householder had severe impairments, namely, cervical and lumbar degenerative disc disease; degenerative changes of the left shoulder; functional neurological

---

[2] Therefore, Householder must show he was disabled between June 1, 2018, the alleged onset date, and September 8, 2020, the date of the ALJ's decision, to be eligible for benefits.

dysfunction; abdominal pain; depressive disorder; and PTSD, but he found Householder did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.)

The ALJ found that Householder had the residual functional capacity to perform sedentary work,[3] except he could occasionally perform postural activities but could not crawl or climb ladders, ropes and scaffolds; he could occasionally push and pull with his upper extremities; he could frequently handle and finger with the left upper extremity; he should avoid exposure to industrial hazards; and he required the use of an assistive device, such as a cane or walker, for ambulation.[4] (R. at 21.) The ALJ found that Householder was unable to perform his past relevant work. (R. at 27.) Based on Householder's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Householder could perform, including the jobs of a hand mounter, a table worker and an ink printer. (R. at 27-28, 55-58.) Thus, the ALJ concluded Householder was not under a disability as defined by the Act from June 1, 2018, the alleged onset date, through September 8, 2020, the date of the decision, and he was not eligible for DIB benefits. (R. at 28-29.) *See* 20 C.F.R. § 404.1520(g) (2021).

---

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (2021).

[4] The ALJ also placed several limitations on Householder's mental work-related abilities; however, since Householder's argument centers around his physical limitations, the court will focus on the facts relevant to the issues raised in Householder's opening brief. (R. at 21-22.)

After the ALJ issued his decision, Householder pursued his administrative appeals, (R. at 158-59), but the Appeals Council denied his request for review. (R. at 1-5.) Householder then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on the Commissioner's motion for summary judgment[5] filed October 8, 2021.

## II. Facts

Householder was born in 1983, (R. at 27, 40), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a degree in criminal justice and past work experience as a police officer, a security guard and an inspector. (R. at 40, 55.) Householder stated he had a cervical disc fusion with hardware installed, but he continued to have symptoms. (R. at 45.) He testified he had difficulty holding his head up due to pain that radiated into his left arm causing numbness in his hand. (R. at 44-45.) Householder stated he could not sit or stand for long periods of time due to his low back pain. (R. at 45.) He stated his neurological disorder caused full body tremors and inability to speak and walk. (R. at 46.) Householder stated that, when he regained the ability to walk after one of these episodes, his right foot "drags." (R. at 46.) He stated he had been using a friend's walker since June 2018 and was prescribed a walker in March of 2020. (R. at 50.) Householder also stated he used a four-point cane. (R. at 50.) In July 2019, Householder was awarded

---

[5] Householder did not file a motion for summary judgment. He did, however, file an opening brief in support of his appeal of the ALJ's decision and an opposition to the Commissioner's motion for summary judgment. (Docket Item Nos. 17, 22.)

benefits from the Department of Veterans Affairs based on his service-connected disabilities, effective March 21, 2019.[6] (R. at 161.)

In rendering his decision, the ALJ reviewed records from Dr. Jack Hutcheson, M.D., a state agency physician; Dr. David Bristow, M.D., a state agency physician; Wake Forest Baptist Medical Center, ("Wake Forest"); James H. Quillen VA Medical Center, ("VA"); Bristol Regional Medical Center; Dr. Brian Dena, D.O.; The Endoscopy Center of Bristol, LLC; Wellmont Medical Associates; HMG Gastroenterology at Kingsport; Medical Specialists of Johnson City; and Holston Medical Group.

Householder has a history of cervical and lumbar pain, right knee pain, right shoulder pain and neurological dysfunction, which consisted of a tremor in his hands, legs and chest. (R. at 266, 1070, 1096, 1102-03, 1123, 1133.) When Householder reported tremors in May 2017, he also reported clumsiness and, at times, tripping and losing his balance.[7] (R. at 1102-03.) In addition, he admitted to drinking heavily and stated he had not consumed alcohol in three days but later

---

[6] Householder served in the Army from 2004 through 2007 and was medically discharged following an all-terrain vehicle, ("ATV"), accident. (R. at 161, 319.) Householder's rated disabilities included 20 percent disability due to limited range of motion of the arm; 20 percent disability related to lumbosacral or cervical strain; 10 percent disability rating for limited flexion of the knee; 20 percent disability rating for superficial scars; 10 percent disability rating for paralysis of sciatic nerve; and 70 percent disability rating for PTSD. (R. at 506-07.)

[7] During this time, Householder was restricted to light work, and he requested that he be released to return to his regular duties as a police officer because he felt better. (R. at 1085, 1087.) On May 26, 2017, Dr. Wendy Worsley, M.D., a physician with the VA, would not release Householder to return to his duties as a police officer until he was seen by pain management and a neurologist. (R. at 1088, 1092.) On May 31, 2017, Kenneth Nystrom, a pain management physician's assistant with the VA, released Householder from his care based on Householder's reports of improvement and he no longer had pain. (R. at 1083.)

-5-

admitted to consuming four 16-ounce beers the previous day.[8] (R. at 1103.) Householder was found to have a vitamin B-12 deficiency and reported his tremor had subsided after receiving B-12 therapy. (R. at 1070, 1109.) In September 2017, Householder developed bilateral pulmonary emboli after making multiple trips back and forth from Florida. (R. at 1052, 1061-62.) He was treated with medication and a CT scan of his chest showed no remnants of his emboli but only a small pleural effusion in the left lower lung. (R. at 1052.)

In February 2018, cervical and lumbar spine MRIs showed degenerative changes at the C5-C6 disc space with bilateral foraminal stenosis with compression of C6 nerve root and lumbar spine degenerative changes with a very mild L5-S1 disc herniation. (R. at 277, 280, 283.) In March 2018, Householder underwent a C5-C6 cervical diskectomy and fusion. (R. at 287-88.) Following surgery, Householder reported mild soreness, neck pain and stiffness but stated he was doing well with "much improved" intermittent left arm weakness but no arm pain. (R. at 291, 296, 331, 353.) He stated he was not taking pain medication or muscle relaxants. (R. at 291, 296, 331, 353.) Householder was advised to proceed cautiously while increasing activity. (R. at 353.)

On May 8, 2018, Householder presented to the emergency department at Wake Forest and reported neurological episodes, which he described as generalized body shaking while he maintained awareness throughout. (R. at 298.) After undergoing a neurological consultation and testing, it was believed Householder's tremors were secondary to anxiety and the cause of his "spells" of altered mental state was possibly a side effect from Ativan. (R. at 304, 306, 309.)

---

[8] Householder reported consuming 10 or more alcoholic drinks four or more times a week. (R. at 1107-08.)

On May 17, 2018, Dr. James Crisp, M.D., a neurologist with Wake Forest, evaluated Householder for generalized shaking of his entire body. (R. at 319.) Householder stated, that during these events, he maintained awareness throughout, but he was not able to speak, communicate or move. (R. at 319.) Householder's muscle tone, bulk and strength were normal; his reflexes were 2+; his coordination and sensation were normal; and his gait was slow with a slight right limp, similar to spastic gait. (R. at 322-23.) Dr. Crisp ordered an electroencephalogram, ("EEG"), and admission to the epilepsy monitoring unit, ("EMU"), to rule out seizures and other neurological issues. (R. at 323.) He stated, that if Householder's testing was negative, it was possible that Householder's symptoms may be secondary to underlying stressors. (R. at 323.)

On June 26, 2018, Householder saw Tabitha Hollins, N.P., a nurse practitioner at Wake Forest, and reported full body tremors. (R. at 331.) He stated when he stopped drinking Mountain Dew "that [] seemed to stop the tremors." (R. at 331.) Householder was scheduled for admission to the EMU, since an MRI of his brain and an EEG, were normal. (R. at 325, 328, 340.) Householder cancelled his appointment at the EMU, stating he had stopped drinking Mountain Dew soft drinks and his "spells" had stopped. (R. at 338.) On September 21, 2018, Householder presented to the emergency department at the VA for body tremors and shaking behavior while walking. (R. at 992-93.) He denied shaking at rest while in supine position. (R. at 992.) A CT scan of Householder's head was normal. (R. at 491-92, 996.) He was diagnosed with a tremor, and it was recommended Householder follow up with his primary care physician and neurology. (R. at 996.)

Throughout 2019, Householder received treatment at the VA for his complaints of joint pain from his neck to his toes, and tremors. (R. at 423, 439, 509,

544, 548-49, 616-17, 711-12, 841-42, 958-59, 970, 979.) In January 2019, chest x-rays were normal. (R. at 1574.) In February 2019, an MRI of Householder's brain showed minimal nonspecific white matter changes, with at least one small nonspecific white matter lesion in the right frontal subcortical white matter appearing new relative to prior MRI. (R.at 1573.) In February 2019, an ultrasound of Householder's right upper quadrant showed gallstones and sludge, (R. at 483-84), and he underwent a laparoscopic cholecystectomy in April 2019. (R. at 823-24.) The following month, Householder reported doing well without complaints. (R. at 808.) In February and April 2019, Householder's knees had crepitus and tenderness, but no effusion; his neck exhibited tenderness and decreased range of motion; and his back exhibited tenderness. (R. at 438, 843, 951.) Otherwise, Householder's physical examinations throughout 2019 generally showed he had no focal neurologic deficits; his muscle strength was equal in all extremities; he had intact range of motion of his upper and lower extremities; he had normal coordination; and his deep tendon reflexes were normal. (R. at 438, 550, 951, 971.)

In March 2019, Householder underwent a neurological consultation at the VA for evaluation of his tremors. (R. at 423.) Dr. James R. Bateman, III, M.D., sated Householder's tremor and right-sided weakness was consistent with a functional neurologic disorder, which had both motor weakness and sensory loss. (R. at 423.) Householder's shoulder shrug was full, bilaterally; he had normal bulk and tone in the upper and lower extremities; he had an intermittent tremor in the lower extremities, bilaterally; he had full strength on the left and the right side had some weakness; he had a positive Hoover's sign[9] and reverse Hoover's sign of the right

---

[9] The Hoover's sign an indication of compensatory movement in legs in which a supine individual, when asked to raise one leg, involuntarily exerts counterpressure with the heel of the opposite leg even if that leg is paralyzed, or if the individual attempts to lift a paralyzed leg, counterpressure is made with the heel of the other leg. *See* https://www.dictionary.com/browse/hoover-s-sign (last visited Aug. 23, 2022).

leg; he had diminished sensation on the right side of the body; his deep tendon reflexes were normal; his grasp reflex was absent, bilaterally; he had normal coordination; and he had a foot-dragging quality to the right leg at times and walked with a walker; and at other times his gait was interrupted with a leg shaking tremor. (R. at 428.) Dr. Bateman stated the findings of the February 2019 MRI of Householder's brain were incredibly small and difficult to appreciate and would not explain Householder's symptoms. (R. at 428-29.) Given Householder's difficulty with ambulation, physical therapy and/or occupational therapy was recommended. (R. at 424.)

In August 2019, x-rays of Householder's right hip and chest were normal, and an EKGs were normal. (R. at 512-13, 519-20, 554.) That same month, Householder requested a powered wheelchair and a cane for ambulation. (R. at 545.)

On September 8, 2019, Householder presented to the emergency department at Bristol Regional Medical Center for complaints of gastrointestinal bleeding.[10] (R. at 567-70.) He was diagnosed with gastrointestinal hemorrhage, unspecified. (R. at 569.) Householder's cardiovascular examination showed regular rhythm and intact distal pulses; his pulmonary examination showed normal effort and breath sounds; his abdomen had tenderness in the epigastric area but no rebound or guarding; and his musculoskeletal examination showed normal range of motion. (R. at 566.) A CT scan of Householder's abdomen showed gastro duodenitis. (R. at 567, 572.) Chest x-rays were normal. (R. at 575.) He was diagnosed with abdominal pain, unspecified. (R. at 567.)

---

[10] Later that month, an anoscopy procedure showed large internal hemorrhoids and a small posterior anal fissure. (R. at 603.) A colonoscopy showed erythema and ulceration in the sigmoid colon and descending colon, compatible with Crohn's colitis and internal hemorrhoids. (R. at 599-600.) In October 2019, an endoscopy showed duodenitis. (R. at 590-92.)

On September 29, 2019, Dr. Brian Dena, D.O., examined Householder at the request of Disability Determination Services. (R. at 582-87.) Householder reported having whole body tremors, an unsteady gait and intermittent episodes of being unable to move his right leg and to speak. (R. at 582.) He reported "shaking spells" with his entire body shaking and stated he was alert and aware during these episodes. (R. at 582.) Householder reported neck surgery improved his arm pain. (R. at 582.) He continued to have chronic back pain worsened with prolonged sitting or standing and improved somewhat by sitting. (R. at 582.) Householder stated he required assistance to perform basic daily living activities, such as bathing and dressing, with the level of required assistance varying based on his symptoms of the day (R. at 583.)

Householder was able to rise from waiting room chair independently; his extremities had no edema and palpable pulses, bilaterally; his coordination was intact; he had a slow wide based gait and was using a cane; he could not walk on his toes or heels; he had 5/5 strength in the upper and lower extremities; his grip strength was 5/5; he had intact sensation in the upper and lower extremities, bilaterally, except he had numbness and tingling in the L4-L5 distribution; he had normal range of motion; and his joints exhibited no deformity or swelling but he had spine tenderness with right lumbar paraspinal hypertonicity.[11] (R. at 584-86.) Dr. Dena noted that, prior to his gait evaluation, Householder began to have a tremulous episode with shaking of the bilateral upper extremity and torso, but it eventually resolved within five minutes of being seated. (R. at 586.) No resting or intention tremor was noted during the evaluation. (R. at 586.) Dr. Dena diagnosed functional neurologic disorder; cervical spondylosis, status post cervical discectomy and fusion; and low back pain without radicular symptoms. (R. at 586.)

---

[11] Hypertonicity or hypertonia is a condition in which there is too much muscle tone so that arms or legs, for example, are stiff and difficult to move. *See https://www.ninds.nih.gov/health-information/disorders/hypertonia* (last visited Aug. 23, 2022).

Dr. Dena opined Householder could stand and/or walk two hours in an eight-hour workday with the use of an assistive device; he could sit six hours in an eight-hour workday with break every two hours; he could occasionally lift and carry items weighing 20 pounds and 10 pounds frequently; he could continuously reach, handle, feel, grasp and finger; and he could continuously bend, stoop, crouch and squat. (R. at 586-87.) He opined Householder needed an assistive device to ambulate. (R. at 587.)

On October 1, 2019, Householder was seen at the VA for complaints of neck pain that radiated into his head and down his right shoulder. (R. at 616-17.) X-rays of Householder's cervical spine showed minimal scoliosis and postsurgical changes of fusion at the C5-C6 disc space along with mild degenerative changes. (R. at 615-16, 625.) On October 8, 2019, Householder underwent a cardiology consultation at the VA for his complaints of constant chest pain since his ATV accident. (R. at 724-25.) His heart had regular rate and rhythm, he had no murmurs, rubs or gallops; and he had normal heart sounds. (R. at 727.) He was diagnosed with atypical chest pain and borderline hypertension. (R. at 728.)

On October 17, 2019, Householder underwent a stress test, which was normal.[12] (R. at 717-18.) On October 22, 2019, Householder complained of low back pain with sciatica and bilateral hip pain. (R. at 715.) On October 23, 2019, x-rays of Householder's bilateral hips showed early degenerative osteophytic change in the right hip; a tiny probable synovial herniation pit at the right femoral head-neck junction; the left hip was well-maintained; and a tiny probable bone island at the proximal left femur. (R. at 1559.) That same day, x-rays of Householder's

---

[12] A Lexiscan ECG stress study was performed due to Householder's right foot drop and walked with a cane. (R. at 718-19.)

lumbosacral spine showed grade 1 retrolisthesis[13] at the L4-L5 level; mild degenerative L4-L5 and L5-S1 disc space narrowing; mild anterior osteophyte formation at the L3-L4 level; early degenerative facet change at the lumbosacral junction; and small L4-L5 limbus vertebra. (R. at 1560.)

On November 6, 2019, Dr. Dr. Jack Hutcheson, M.D., a state agency physician, completed a medical assessment, indicating Householder had the residual functional capacity to perform light[14] work, except he could stand and/or walk four hours in an eight-hour workday; sit six hours in an eight-hour workday; push/pull as much as the lift/carry restrictions; frequently balance, stoop, kneel, crouch and crawl and occasionally climb; and he should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 73-75.) Dr. McGuffin opined Sexton had no manipulative, visual or communicative limitations. (R. at 74.) On February 12, 2020, Dr. David Bristow, M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. Hutcheson from November 6, 2019. (R. at 94-96.)

On January 2, 2020, Householder continued to complain of chest pain. (R. at 1628.) His examination findings were normal. (R. at 1631.) He was diagnosed with atypical chest pain, no progression; borderline hypertension, controlled; and hyperlipidemia. (R. at 1632.)

---

[13] Retrolisthesis is a posterior or backward slippage, and its severity is graded from one to four based on the posterior displacement of the vertebral body's foramen. Grade 1 retrolisthesis has a mild degree or up to 25 percent of posterior displacement. *See* https://www.spineuniverse.com/conditions/spondylolisthesis/retrolisthesis-differs-spondylolisthesis (last visited Aug. 23, 2022).

[14] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2021).

On January 17, 2020, Householder saw Dr. Douglas P. Williams, M.D., a physician at Wellmont Medical Associates, for movement disorder. (R. at 1804.) Household stated he experienced tremors, whole-body paralysis and "spells" where his whole body shakes and his right leg will drag. (R. at 1804.) Householder's musculoskeletal system had normal range of motion; his pulses and deep tendon reflexes were normal; and he had normal muscle bulk, strength and sensation. (R. at 1805-06.) Dr. Williams diagnosed functional movement disorder and stated the best treatment was cognitive behavioral therapy. (R. at 1806.)

On January 22, 2020, Householder saw Dr. Alison D. Whitman, M.D., a physician at Holston Medical Group, to establish care. (R. at 2166.) Householder had a normal gait; he had no clubbing, cyanosis, joint swelling or involuntary movements; and he had no apparent tremor. (R. at 2166.) Dr. Whitman diagnosed PTSD; neck pain; tremor; chest pain; and arthralgia of multiple sites. (R. at 2167-68.)

On February 11, 2020, Householder was seen for an urgent appointment at the VA for mental health and lower back pain that radiated into his lower extremities, right worse than left. (R. at 2014, 2024.) He stated it hurt to stand, sit and walk. (R. at 2024.) Householder's extremities had no edema or cyanosis and his lower back and paraspinal muscles had tenderness, more on the right than on the left. (R. at 2015.) He was diagnosed with low back pain and encouraged to exercise. (R. at 2015-16.)

On March 6, 2020, Householder presented to occupational therapy at the VA for an electric mobility assessment. (R. at 1995.) His symptoms included difficulty walking and weakness related to degeneration of the intervertebral disc and arthritis.

(R. at 1998.) Householder was able to walk 125 feet with a quad cane and 125 feet while using a rollator walker. (R. at 1997.) He had improvement in lumbar sway and decreased limp with the use of rollator. (R. at 1997.) Householder had normal range of motion in his upper and lower extremities; his muscle strength was 4/5 in both the upper and lower extremities; he had intact gross and fine coordination; he had no increase in muscle tone; and he presented as a low fall risk. (R. at 1997-98.) Householder had an episode of tremoring that began in his legs and evolved into his arms after he sat down. (R. at 1998.) He was able to regain control with cues to grip items. (R. at 1998.) Based on Householder's decreased muscle strength, endurance and impaired ambulation, a rollator was recommended. (R. at 1998-99.)

On March 19, 2020, Householder saw Dr. Whitman, and reported cervical radiculopathy with numbness and tingling in his arms. (R. at 2162.) Householder had a normal gait, and he had no clubbing, cyanosis, joint swelling or involuntary movements. (R. at 2163.) Dr. Whitman ordered an MRI of Householder's cervical spine. (R. at 2162.) On March 20, 2020, an MRI of Householder's lumbar spine showed multilevel lower lumbar disk and facet disease with superimposed subtle rightward herniated nucleus pulposus at the L5-S1 level; mild to moderate left facet arthrosis and patent canal foramina at the L1-L2 level; mild to moderate bilateral facet arthrosis and patent canal foramina at the L2-L3 level; diffuse disk bulge and spondylosis impressing the ventral thecal sac with mild to moderate bilateral facet arthrosis causing mild spinal canal stenosis with narrowing of the midline anteroposterior canal and mild to moderate left foraminal stenosis at the L3-L4 and L4-L5 levels; and subtle shallow right paracentral disk protrusion abutting the right S1 nerve root with mild bilateral facet arthrosis and patent canal foramina at the L5-S1 level. (R. at 2090-91.) On March 31, 2020, an MRI of Householder's cervical

spine showed cervical fusion hardware and some mild to moderate foraminal narrowing at the C5-C6 disc space. (R. at 2157.)

On April 20, 2020, Householder was seen by Ashley Stewart, F.N.P.-C., a certified family nurse practitioner at Medical Specialists of Johnson City, for joint pain and stiffness and decreased range of motion in the neck, back and bilateral upper and lower extremities. (R. at 2135.) Householder had no joint swelling or synovitis, good range of motion, normal grip strength and no tenderness in his neck or spine. (R. at 2137-38.) Stewart diagnosed arthritis, chronic back pain and chronic diarrhea. (R. at 2138, 2141.)

On April 21, 2020, Householder saw Dr. Whitman, and reported neck pain and left arm numbness. (R. at 2151.) He also reported a history of Crohn's disease with chronic diarrhea. (R. at 2151.) Householder had a normal gait, and he had no clubbing, cyanosis, joint swelling or involuntary movements. (R. at 2151.) Dr. Whitman discussed obtaining a service dog and possible use of cannabidiol, ("CBD"), oil for pain. (R. at 2151.) Dr. Whitman referred Householder to gastroenterology for Crohn's disease. (R. at 2151.)

On May 5, 2020, saw Dr. Jennifer Phemister, M.D., a physician with HMG Gastroenterology at Kingsport, for possible Crohn's disease and rectal bleeding. (R. at 1910.) Householder reported daily stools with intermittent rectal bleeding but denied abdominal pain and weight loss. (R. at 1910.) Householder stated he had been given nitroglycerine cream for a possible fissure, but he had not utilized the medication. (R. at 1910.) His examination was normal, including no obvious neurologic deficits. (R. at 1911.) Dr. Phemister diagnosed possible Crohn's disease. (R. at 1911.)

On May 21, 2020, Householder saw Robert Rutherford, N.P.-C., a certified nurse practitioner at Holston Medical Group, and requested Rutherford complete his disability forms. (R. at 2131.) Rutherford examined Householder and completed a Multiple Impairment Questionnaire. (R. at 1885-92.) Rutherford reported that Householder exhibited no involuntary movements; his gait was antalgic, bilaterally; he had mildly decreased upper extremity grip strength, bilaterally; he had decreased range of motion of the cervical spine; he had mildly decreased bilateral lower extremity strength, left greater than right; and his deep tendon reflexes were 2+ and symmetric. (R. at 1885, 2133.) He stated Householder's symptoms included pain, fatigue, tremor, intermittent paralysis and aphasia and functional neurological disorder. (R. at 1886.) Rutherford reported Householder experienced pain daily in his neck, left arm, low back and bilateral knees, and his pain was exacerbated by physical activity. (R. at 1886-87.) Rutherford based these findings on his diagnosis of chronic neck and back pain, PTSD and functional neurologic disorder. (R. at 1885, 2133.)

Rutherford opined Householder could sit up to one hour in an eight-hour workday; stand and/or walk one hour in an eight-hour workday; he would need to get up and move around every 15 minutes and could return to sitting after five or 10 minutes; he could lift and carry items weighing up to five pounds occasionally; he was limited in his ability to reach, to handle and to finger due to intermittent arm and hand numbness, tremor episodes and paresthesia; he was moderately[15] limited in his ability to use his right upper extremity to grasp, turn and twist objects and to use his fingers and hands for fine manipulation; he was markedly[16] limited in his ability to use his left upper extremity to grasp, turn and twist objects and to use his

[15] Moderate is defined as significantly limited but not completely precluded. (R. at 1088.)

[16] Marked is defined as essentially precluded. (R. at 1088.)

fingers and hands for fine manipulation; and he was markedly limited in his ability to use both arms for reaching, including overhead. (R. at 1887-89.)

Rutherford stated that Householder's symptoms would likely increase if he were placed in a competitive work environment and he could not perform full-time work that involved keeping his neck in constant position, such as looking at a computer screen or looking down at a desk. (R. at 1889-90.) He opined Householder's impairments would last at least 12 months and he was "currently unable to work." (R. at 1890.) Rutherford found that Householder would need to avoid noise and he had a limited ability to push, to pull, to kneel, to bend and to stoop. (R. at 1891.)

On June 9, 2020, Householder saw Dr. Whitman, and reported neck and back pain, numbness and tingling in his left hand and numbness and tingling in his legs. (R. at 2105.) He stated he was at the beach recently and his back pain got so bad that he had to go to the emergency room. (R. at 2105.) Householder stated he did not want pain medication but requested to be evaluated to see if he may need another surgery or epidural. (R. at 2105.) He stated his Crohn's disease was doing okay. (R. at 2105.) Householder had a normal gait; he had no clubbing, cyanosis, joint swelling or involuntary movements; he had normal strength and deep tendon reflexes; and his straight leg raising test was normal, bilaterally. (R. at 2105.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires

the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Householder argues the ALJ erred by finding he had the residual functional capacity to perform sedentary work. (Plaintiff's Opening Brief In Support Of Appeal Of Decision Denying His Claim For Disability Benefits, ("Plaintiff's Brief"), at 1, 10-12.) Householder argues the ALJ erred by failing to find his impairment met or equaled disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, § 1.04. (Plaintiff's Brief at 1, 5-10.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2021) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[17]

---

[17] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions 20 C.F.R. § 404.1513(a)(2) (2021). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2021).

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2021).[18] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

---

[18] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2021).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2021). The ALJ found that Householder had the residual functional capacity to perform sedentary work, except he could occasionally perform postural activities but could not crawl or climb ladders, ropes and scaffolds; he could occasionally push and pull with his upper extremities; he could frequently handle and finger with the left upper extremity; he should avoid exposure to industrial hazards; and he required the use of an assistive device, such as a cane or walker, for ambulation. (R. at 21.)

Householder argues the ALJ erred by failing to find his impairment met or equaled disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, § 1.04. (Plaintiff's Brief at 1, 5-10.) Householder contends the ALJ improperly evaluated his impairments under § 1.04 because he assessed whether Householder met all the criteria for § 1.04 in a 12-month period. (Plaintiff's Brief at 6-7.) He alleges that such an evaluation runs afoul of the Fourth Circuit's holding in *Radford v. Colvin*, 734 F.3d 288, 294 (4th Cir. 2013), and asserts that Acquiescence Ruling, ("AR"), 15-1(4) should be overturned.

Section 1.04 requires that disorders of the spine result in *compromise of a nerve root or the spinal cord* with either (A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test; or (B) spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; or (C) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in § 1.00(B)(2)(b). 20 C.F.R. Part 404, Subpart P, § 1.04 (2021).

For a claimant to demonstrate that his impairments meet or equal a listed impairment, he must prove that he "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). However, the claimant is not required to prove the impairment met all the specified

medical criteria in § 1.04 at the same time. *See Radford*, 734 F.3d at 294 ("A claimant need not show that each symptom was present at precisely the same time – i.e., simultaneously – in order to establish the chronic nature of his condition. Nor need a claimant show that the symptoms were present in the claimant in particularly close proximity.").

The Social Security Administration, ("SSA"), issued AR 15-1(4) in response to the Fourth Circuit's decision in *Radford*. It explained it would use the following evaluation in claims in which the claimant resided in the Fourth Circuit:

> Adjudicators will decide whether the evidence shows that all of the medical criteria in paragraph A are present within a continuous 12-month period (or, if there is less than 12 months of evidence in the record, that all the medical criteria are present and are expected to continue to be present). If all of the medical criteria are not present within a continuous 12-month period, adjudicators will determine that the disorder of the spine did not meet the listing.

> If all of the medical criteria in paragraph A are present within a continuous 12-month period (or are expected to be present), adjudicators will then determine whether the evidence shows – as a whole – that the claimant's disorder of the spine caused, or is expected to cause, nerve root compression continuously for at least 12 months. In considering the severity of the nerve root compression, the medical criteria in paragraph A need not all be present simultaneously, nor in particularly close proximity. The nerve compression must be severe enough however, that the adjudicator can fairly conclude that it is still characterized by all of the medical criteria in paragraph A.

80 Fed. Reg. 57418-02, 57420, 2015 WL 5564523 (Sept. 23, 2015). Although AR 15-4 has subsequently been rescinded in response to the revision of the listed

impairments, it was effective at the time of the ALJ's decision. *See* 85 Fed. Reg. 79063-01, 2020 WL 7209986 (Dec. 8, 2020) (rescinding AR-15(4) because the regulation that was the subject of the AR had been revised).

The ALJ concluded Householder's impairment did not meet § 1.04, noting "the record does not demonstrate compromise of a nerve root … or the spinal cord …." (R. at 19.) In determining Householder did not meet or equal § 1.04, the ALJ stated he followed AR 15-1(4) in applying the Fourth Circuit's holding in *Radford*. (R. at 19.) He stated he used the "more free-form, contextual inquiry that makes 12 months the relevant metric for assessment" in finding that the evidence did not show that Householder met all the requirements of § 1.04(A) in a 12-month period. (R. at 19.) The ALJ noted that multiple examinations showed Householder had no neurological deficits and he cited three visits in January, April and August 2019, which showed Householder had intact sensation and exhibited 5/5 strength in both lower extremities. (R. at 19.) While this evidence supports the ALJ's finding that Householder's impairment did not meet § 1.04(A), the record also contains evidence that Householder's impairment met § 1.04(C). Nonetheless, the ALJ's decision does not address whether Householder's impairment met this section.

The ALJ noted Householder's February 2018 lumbar spine MRI, which showed degenerative changes with disc herniation at the L5-S1 level, as well as his cervical MRI, which showed degenerative changes at the C5-C6 disc space with bilateral foraminal stenosis. (R. at 23.) However, he failed to mention Householder's March 2020 lumbar spine MRI, which showed a herniated nucleus pulposus at the L5-S1 level; mild to moderate facet arthrosis and patent canal foramina at multiple levels; a disk bulge and spondylosis impressing the ventral thecal sac; bilateral facet arthrosis causing spinal canal stenosis; foraminal stenosis; and disk protrusion

abutting the S1 nerve root. Thus, the record contains medically acceptable imaging showing that he suffered from lumbar spinal stenosis as required by § 1.04(C).

The record also shows Householder's gait was described as slow with a slight limp, antalgic and slow wide based with the use of a cane. (R. at 323, 586, 2133.) At various office visits spanning 2018 through 2020, Householder also exhibited an intermittent tremor in his bilateral lower extremities; weakness in his right side that had a "giveaway quality;" diminished sensation of the right side of his body; numbness and tingling in the L5-L5 distribution; spine tenderness with right lumbar paraspinal hypertonicity; intermittent radiculopathy of the lower extremities; lower back pain that radiated into his lower extremities; and decreased bilateral lower extremity strength.

In addition, Dr. Dena noted Householder walked with a walker and had a foot dragging quality to his right leg and, at other times, his gait was interrupted with leg shaking tremor. He opined Householder required an assistive device to ambulate. In addition, a rollator was recommended because Householder had decreased strength, endurance and impaired ambulation. The record also shows that Householder had to participate in a Lexiscan ECG stress study due to his right foot drop and the need to walk with a cane. Thus, the record also shows that Householder suffered from pain and weakness resulting in inability to ambulate effectively.

Given the deficiencies in the ALJ's analysis of this evidence, I do not find substantial evidence exists to support the ALJ's finding that Householder's impairment did not meet or equal § 1.04(C) and ultimate finding that Householder was not disabled and not entitled to DIB benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's finding that Householder's impairment did not meet or equal § 1.04(C); and

2. Substantial evidence does not exist in the record to support the Commissioner's finding that Householder was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand Householder's claim to the Commissioner for further development.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     August 23, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE